THE ADVERTISING CORP. OF AMERICA *v.* UNITED STATES (No. 4503) [1]

United States Court of Customs and Patent Appeals, March 4, 1946

Sharretts & Hillis (E. P. Sharretts and Samuel M. Richardson of counsel) for appellant.

Paul P. Rao, Assistant Attorney General (Sybil Phillips and Richard F. Weeks, special attorneys, of counsel), for the United States.

[Oral argument December 5, 1945, by Mr. Edward P. Sharretts and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the importer from the judgment of the First Division of the United States Customs Court overruling two protests against the collector's classification of, and duty assessment upon, certain pigskin leather, frequently referred to in the record as "Brindle" pigskin. The collector, holding the merchandise to be fancy leather, assessed duty at the rate of 30 per centum ad valorem under paragraph 1530 (d) of the Tariff Act of 1930, the pertinent portion of which reads:

PAR. 1530 * * *

(d) Leather of all kinds, grained, printed, embossed, ornamented, or decorated, in any manner or to any extent (including leather finished in gold, silver, aluminum, or like effects), or by any other process (in addition to tanning) made into fancy leather * * * all the foregoing by whatever name known, and to whatever use applied, 30 per centum ad valorem.

The original protests of the importer claimed the merchandise to be properly dutiable at 12½ per centum ad valorem under paragraph 1530 (c) of the act, as modified by the provisions of the trade agreement with the United Kingdom, T. D. 49753, 74 Treas. Dec. 276.

After the appeal from the collector's decision on the protest and before the trial of the case in the Customs Court began, the protests were amended to present an alternative claim that the merchandise is properly dutiable at 15 per centum ad valorem under paragraph

1530 (c) by reason of a proclamation by the President of the United States, T. D. 44603, 59 Treas. Dec. 285, issued February 10, 1931, under the authority of section 336 of the Tariff Act of 1930, the so-called flexible tariff provision of the act. No assignment of error accompanying the appeal to us (although the question is discussed in the brief for appellee) covers or refers to this alternative claim. Under the well-known practice, therefore, that claim must be treated as having been abandoned, but it may be said that if the merchandise be properly classifiable under paragraph 1530 (c) the correct duty rate would be 12½ per centum, the rate fixed in the Presidential proclamation having been supplanted by the trade agreement.

So, the issue before us involves only paragraphs 1530 (d), *supra*, and 1530 (c), as modified by the trade agreement reported in T. D. 49753, and, in the final analysis, the question is whether the pigskin leather had been "made into fancy leather."

The pertinent portion of paragraph 1530 (c) as enacted, reads:

(c) Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem * * *

It will be observed that pigskin leather is not mentioned *eo nomine* in either 1530 (d) or 1530 (c), and it may be added that it is not so mentioned elsewhere in the Tariff Act of 1930.

The trade agreement modified the rates of duty provided in the act as originally passed upon various kinds of leather and leather articles, some specifically named. Among those so named was pigskin leather, the provision affecting it reading as follows:

T. D. 49753, 74 Treas. Dec. 276

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 1530 (c) | * * * <br> Pigskin leather: <br>   If imported to be used in the manufacture of boots, shoes, or footwear, or cut or wholly or partly manufactured into uppers, vamps, or any forms or shapes suitable for conversion into boots, shoes, or footwear. <br>   Other | 10% ad val. <br> 12½% ad val. |

The rate provided in paragraph 1530 (d) for such leathers as are cut or manufactured into forms suitable for conversion into boots, shoes, or footwear was reduced from 30 per centum to 20 per centum, but that is of no importance here inasmuch as it is conceded the leather here involved was not imported to be used in the manufacture of boots, shoes, or footwear.

If properly classifiable under paragraph 1530 (d), therefore, it was subject to the duty rate of 30 per centum as assessed by the collector.

On the other hand, if properly classifiable under paragraph 1530 (c) it falls under the provision for "Other" [leather] in that paragraph with a duty rate of 12½ per centum.

Certain questions relative to the construction of the statutes were discussed and ruled upon by the trial court, but its decision rested primarily on its holding as to the factual evidence, the court saying after a brief review of the evidence:

It appears to be manifest that the plaintiff has not by the evidence offered made out a *prima facie* case sufficient to overcome the presumption of correctness attaching to the collector's classification of the leather in issue as "fancy leather."

The evidence introduced on behalf of the importer consists of a deposition (Exhibit 1) of one Holden T. White, the governing director of the exporter of the merchandise, taken in England under a commission issued by the trial court, and a physical exhibit (No. 2) consisting of a sample of the imported merchandise.

The evidence on behalf of the Government consists of the testimony of one Martin G. Kliemand, a sales distributor for tanners of pigskin leather, taken orally. During his cross-examination counsel for the importer caused to be introduced in evidence, as "Plaintiff's Illustrative Exhibit A," a collection of small pieces of leather, furnished by the witness and stated by him to be samples of the pigskin produced by the tannery operated by his company in the United States.

It was stipulated by counsel for the respective parties, counsel for the Government acting on the advice of the examiner who was present at the trial, that the sample of the imported merchandise, Exhibit 2, "is neither grained, printed, nor embossed," and the sample itself seems to us to show that it is not "finished in gold, silver, aluminum, or like effects." So, the question is reduced to one of whether by any finishing process "(in addition to tanning)," it was "made into fancy leather."

It appears from the decision of the trial court that it gave much weight to the sample which, of course, was not improper since, as often has been said, "A sample may be a very potent witness" in determining the proper classification of merchandise. Its description of the sample reads:

It appears to consist of pigskin leather on which there is a mottled effect, or, in other words, dark spots here and there on the background of a lighter finish.

To this we may add that the black spots alluded to appear irregularly both as to size and location on the lighter background.

Importer's witness White, whose testimony evidences his familiarity with the processes of tanning and finishing pigskin leather, after identifying the invoice numbers covering the involved importations, in answer to a direct interrogatory said:

I am, therefore, describing the processes and materials used to procure the finish known as Brindle. The pigskins are tanned and curried and, dressed in the nor-

mal way for such leather, with the exception of the final finish which has a mottled or Brindle effect. The normal method of finishing a pigskin is to give it an even coat of stain, but in the case of the Brindle finish exactly the same color is applied but it is put on very uneven. In other words the finishing coat is very badly applied indeed. One might say that slovenly work is accentuated. In the finishing of these as in all our pigskins, no pigment but only aniline stain is used and the pigskins are in no way decorated or embossed.

In answer to cross-interrogatory No. 9, asking that he describe in detail the nature of the processes, the materials employed, etc., he testified:

Pigskins are purchased in Scotland from those bacon curers who skin the carcass of the pig prior to curing the flesh into bacon etc. The pigskins are lined, baited and tanned in a manner similar to the manufacture of all leathers. The pigskins are then split and shaved to the weight required, set out for curriers to grease, i. e. curried. They are then dyed to the color required and stretched. A final coat of color is applied. The skins are pressed flat or rolled and the flesh side is finished either glace or soft as required. In other words, the processes employed are very similar to the dressings of all leathers.

In answer to cross-interrogatory No. 13, asking that he "describe in detail the reasons which caused this spotty appearance," he said:

The very uneven or slovenly manner in which the final coat of stain is applied to the skins causes the spotty appearance. No pigment is used nor are the skins in any way decorated or embossed, and no print or pattern is superimposed or applied to the surface.

The foregoing embraces all the testimony of the witness White pertinent to the issue. It will be observed that he did not describe any method by which the "aniline stain" is applied to the tanned pigskin in the process used by his company in England, and it also may be said that he was not called upon to express (nor did he express) any opinion upon the question of whether the involved merchandise which his company had exported was "fancy leather."

The trial court, obviously relying largely upon the appearance of the sample, said:

Although the witness used the term "slovenly work" in describing the manufacture of the skins at bar, it is clear that the mottled or brindle effect was deliberately sought and was in nowise accidental.

With respect to the last-quoted holding, it does not necessarily follow, as we view it, that the mottled or brindle effect, even if deliberately sought and obtained, resulted in a fancy leather product such as that contemplated in paragraph 1530 (d), *supra*.

The trial court made reference to the testimony of the Government's witness, Mr. Kliemand, doubtless a well-qualified witness upon the matters concerning which he testified, and evidently (because of the reference to it) gave his opinion evidence respecting Exhibit 2 some weight, saying:

Mr. Kliemand stated that tanning and finishing of leather are two distinct processes, the latter starting where the former leaves off. Shown exhibit 2, he said

that it did not have the same appearance as a usual piece of finished pigskin, which, he said, is of a single color, and he characterized exhibit 2 as fancy leather.

The decision of the trial court makes no reference to illustrative exhibit A, hereinbefore mentioned, nor does the brief on behalf of the Government make any reference to it.

We assume the several samples embraced in the exhibit were introduced in evidence at the instance of the importer principally for the purpose of comparing them with Exhibit 2. The colors, upon their colored sides, are solid—that is, they are not mottled as is Exhibit 2. The coloring was described by Mr. Kliemand as a finishing process of previously tanned pigskin, and he stated that the colors were applied by means of a spray gun. He testified that no one of the samples was fancy leather. This latter apparently was a matter of opinion on the part of the witness. There is no showing as to what the administrative practice has been with respect to the classification of leathers finished in solid colors—in fact, there is no showing that any has been imported.

Mr. Kliemand had never observed the tanning and finishing of pigskin leather in England and his declaration that Exhibit 2 is fancy leather appears to be wholly a matter of opinion based upon his observation of the sample in the light of his knowledge respecting the tanning and finishing processes used by the company with which he is connected. Notwithstanding the reasons which he gave for believing that Exhibit 2 is fancy leather (he gave no definition of "fancy leather" nor have we been able to find any satisfactory definitions of the term, judicial or otherwise), we find it difficult to reconcile his opinion as to it with his opinion that the samples in Illustrative Exhibit A are not ·fancy leathers.

So far as we can discern from a careful inspection of the several samples, the only material difference between Exhibit 2 and the others is in the appearance of Exhibit 2 by reason of the mottled effect created by the dark spots or blotches on the former. In structure all appear to be substantially the same.

There has been no judicial definition of the term "fancy leather" so far as we have been able to find. In the case of *United States* v. *Pacific Binding Library Co.*, 22 C. C. P. A. (Customs) 641, T. D. 47617, we had before us a question involving the classification of certain colored morocco leather used almost exclusively for bookbinding which the collector had classified as fancy leather. We there sustained the collector's classification (thus reversing the judgment of the trial court), but we rested our decision upon the ground that the importer had "not established that the collector's classification was erroneous," and did not attempt judicially to define the tariff meaning of the term "fancy leather," saying "* * * it is

not our present purpose to so construe the term as to precisely fix its boundaries."

The term has not been specifically defined legislatively, but we think some deductions respecting definition may be drawn from the language of paragraph 1530 (d) quoted, *supra*.

A reasonable interpretation of the pertinent language of the paragraph seems to be that Congress intended that leather of any kind processed by graining, printing, ornamenting, or decorating in any manner, should be regarded as fancy leather and that leather *finished* in gold, silver, aluminum, or like effects, should be regarded in the same manner. It seems also that Congress contemplated that leathers might be made into fancy leather by processes other than those so named. An example might be a staining process if such process ornamented or decorated the final product.

We think it important to note that the text of the trade agreement here invoked by appellant is confined to paragraph 1530 (c) of the Tariff Act of 1930, which expressly excepts leather provided for in paragraph 1530 (d) (see text, *supra*), and so far as here pertinent deals only with leather (limited to pigskin leather) "in the rough, in the white, crust, or russet, partly finished, or finished."

Reading paragraphs 1530 (d) and 1530 (c) together it is our view that it was the intention of Congress that leathers decorated or ornamented in any manner (in addition to tanning) should be classified under paragraph 1530 (d) as fancy leather and bear duty accordingly.

We are not convinced that the importer, upon which the burden rested, developed a state of facts showing that the merchandise involved was not decorated or ornamented by the processing to which it had been subjected before importation.

The judgment of the Customs Court is *affirmed*.